# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COLUMBIA

| | |
|---|---|
| **J. K. IDEMA, EDWARD CARABALLO,**<br>**And, BRENT BENNETT,**<br>                              *Plaintiffs,*<br>*v.*<br><br>**UNITED STATES DEPARTMENT OF STATE**<br>**UNITED STATES DEPARTMENT OF JUSTICE**<br>**FEDERAL BUREAU OF INVESTIGATION**<br>    (US Department of Justice)<br>**UNITED STATES MARSHALS SERVICE**<br>    (US Department of Justice)<br>**DEPARTMENT OF DEFENSE,**<br>**DEFENSE INTELLIGENCE AGENCY**<br><br>                              *Defendants.* | Civil Action No. #:<br>**05 CV 01334 (EGS)**<br><br><br>1) **VAUGHN MOTION**<br>2) **MEMO OF LAW**<br><br>**FOIA LITIGATION**<br><br>Assigned Judge:<br>**Hon. Emmet G. Sullivan**<br><br>**ECF CASE** |

## MOTION FOR VAUGHN INDEX

**NOW COMES,** plaintiff J. K. Idema, through counsel,[1] and moves this Honorable

Court to direct defendants, and each of them, to provide ***Vaughn* indexes** to plaintiffs

within 14 days[2] of the Court's Order, and to move the October 31, 2006 hearing forward.

---

[1] Although counsel is seeking to withdraw in the collateral *habeas corpus* case, counsel remains resolute in his belief of these two cases, and assertion of government violations of these men's rights and the law.  Unfortunately, these cases were involuntarily transferred to the DCDC by the SDNY contrary to law.  Plaintiff previously and repeatedly asserted that this was done specifically to deprive plaintiffs of *due process* and right to counsel and obstruct justice.  Further, to escalate the costs of litigation in favor of the government and heavily against plaintiffs for improper purposes.  After years of litigation the government's tactics have succeeded in the financial devastation they sought.

[2] Plaintiff is requesting that the Court reduce the normal 20 days to 14 days so that a hearing may proceed within 21 days, but no later than October 16, 2006.  Plaintiffs base this request on the continued bad faith of defendants who have refused to provide any relevant documents, with the exception of the DOD providing two non-responsive documents, and the US Marshals complying with FOIA documents which had the only relevant information redacted.

Far more than one year ago, plaintiff sought Vaughn indexes. The SDNY Court denied that motion without any consideration. After two years of government refusals to provide documents, this matter is ripe for the Court's intervention and order for relief.

Plaintiff also files his strenuous object to the repeated and constant continuances to this action and the collateral habeas corpus action and requests the hearing be expedited and moved forward. This case has been continued approximately five times in five months, without a single resolution of any issue. In fact, defendants have, over these past months, ignored the Court's order to provide transcripts of hearings. As this Court knows, Mr. Lev has asserted "security issues" with traveling to Pulacharke Prison. Unfortunately for Mr. Lev, officials of the United States Embassy Consular Office have been tape-recorded, photographed, and/or witnessed visiting Pulacharke Prison on at least seven different occasions, **once to attend a ribbon cutting ceremony on a building**. It is hard to believe these repeated disingenuous claims of fear of visiting Pulacharke to deliver mail and Court ordered documents when Consular officials are cutting ribbons, having lunch with the commanders, and drinking tea on a regular basis. Yet they continue to refuse to deliver mail to plaintiffs <u>including</u> the Court ordered transcripts.

Defendants have engaged in other vicious actions, such as requesting Pulacharke officials use deadly physical force against Idema and Bennett, confiscate their phones, and assault them, all of which has been refused by the Afghans, who apparently consider Idema a hero of their country (*see* **Exhibit 1**; Emails of Lt. Colonel "Mike").

If ever expeditious Vaughn indexes were warranted, this is the case.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION

In this action under the Freedom of Information Act, 5 U.S.C. § 552, as amended, ("FOIA"), plaintiffs seek access to documents in the possession of the Department of State ("DOS"), the Department of Justice ("DOJ"), the Federal Bureau of Investigation ("FBI"), the Department of Defense ("DOD"), the Defense Intelligence Agency ("DIA"), and the United States Marshals Service ("USMS") concerning plaintiff Idema and his associates and co-plaintiffs, and events in Afghanistan and the United States, between January 2004 and the present date, that either included plaintiffs or took place regarding plaintiffs. Plaintiffs seek NO documents subject to classification. The precise documents which plaintiffs seek access to are itemized in the FOIA letters from plaintiffs, dated between July 2004 and May 2005, and attached to the Complaint as Exhibit 1.

This action was filed on June 1, 2005 in the SDNY and involuntarily transferred to the DCDC. Defendants allegedly filed their answer on July 29, 2005, after obtaining a delay, but did not serve that answer on the three plaintiffs until September 5, 2005, more than thirty days later. Sixteen months ago, plaintiff sought Vaughn indexes. The SDNY Court denied that motion on June 15, 2005 without cause, absent opposition, and without making any determination of facts or law (see SDNY Order; "ORDERED, that all pending motions are denied," June 15, 2005 USDJ Hellerstein). Even after transfer, the Court continued to consider Vaughn indexes as premature. As of now, plaintiffs continue to operate in a theater of darkness, barely a single document at issue identified as even existing, where its location might be, and what that document might contain.

It is well established law in this Circuit, and in the federal courts, that a plaintiff in a FOIA case is <u>entitled</u> to an index of the documents and portions of documents that have been or will be withheld by the defendant agency. *Vaughn v. Rosen,* 484 F. 2d 820 (D.C. Cir. 1973), <u>cert.</u> <u>denied</u>, 415 U.S. 977 (1974); *Donovan v. F.B.I.*, 625 F.Supp. 808, 811 (S.D.N.Y.), aff'd in relevant part, 806 F.2d 55 (2d Cir.1986).  That index must describe each document that has been withheld and give a detailed justification of the agency's grounds for nondisclosure, correlating each exemption of the FOIA upon which the agency relies with the record or portion of the record to which the exemption purportedly applies. *Vaughn, supra.*  Moreover, the description of the withheld material must be "sufficiently specific to permit a reasoned judgment as to whether the material is actually exempt under the FOIA." *Founding Church of Scientology v. Bell,* 603 F.2d 945, 949 (D.C. Cir. 1979).

An unusual aspect of this case is that plaintiffs seek not just government generated documents which they have a clear right to, but also seek plaintiffs own documents which were illegally seized by the government and remain in the possession and control of defendants.  Copies of these documents wrongfully possessed by defendants are absolutely discoverable under the FOIA laws.  In spite of defendants' disingenuous and patently false claims to the contrary, the FBI did seize plaintiffs' documents and did sign for original documents, photographs, emails, audiotapes, and videotapes and have now been caught lying about their possession of these documents illegally seized and now withheld in violation of the FOIA.  Defendants continued misrepresentations to the Court,

the international press, and plaintiffs, are for good cause—the government seeks to cover-up their outrageous conduct in Afghanistan, and their knowingly false lies to the international media—precisely the reasons the FOIA was enacted, to prevent government fraud, propaganda, knowingly false statements, and egregious manipulation of the public facts.  In a nutshell, the government cannot afford to release the documents and tapes, and the American public cannot afford to have them destroyed or forever buried.

In this case, it is known that there are hundreds of documents, pictures, audiotapes, and videotapes, many of which are plaintiffs' property and were illegally seized by the FBI, that have been withheld from the plaintiffs in whole, without a single one of <u>those</u> documents or records ever produced and with very few, and very limited, disingenuous responses written by the defendants who did actually respond.  In fact, more than 40 FOIA requests and appeals were filed over 14 months without ONE SINGLE relevant record[3] ever produced[4] for any plaintiff.

What persists to be of critical importance in this case is that two plaintiffs continue real and serious danger due to defendants FOIA denials, obstruction, and the third plaintiff (Edward Caraballo) faces ongoing liberty restraints[5] as a result.  Upon information and belief, the spoliation of evidence and destruction of documents in

---

[3] Additionally, upon information and belief, dozens of FOIA requests have been filed by third parties related to these plaintiffs and on behalf of these plaintiffs, and not one of those has ever produced a single document, only boilerplate denials and obstruction,  *e.g.*: Denial of Jackie Rios FOIA request by DOS, attached hereto as **Exhibit 2**.

[4] As previously stated, the few documents provided by the Department of Defense and US Marshals, were either irrelevant or the only relevant information had been redacted.

violation of law has already occurred.[6]  Plaintiff therefore vigorously renews his request

that defendants be enjoined from destroying relevant documents or records while this

litigation is pending.  *See: Jefferson*, No. 96-1284, slip op. at 10 (D.D.C. Mar. 29, 2000)

(finding that an AUSA prematurely "destroyed records responsive to [the] FOIA request

while [the FOIA] litigation was pending).  Apparently, AUSA obstruction is not unusual.

While the government continues to delay and obstruct, two plaintiffs in this case

remain in imminent danger directly as a result of defendants' withholding of documents

and records, much of which is the rightful personal property of plaintiffs seized in July

2004 by one or more defendants in Afghanistan, (*see* FBI Receipt **Exhibit 3**).

Therefore, plaintiff again, vigorously requests an expedited *Vaughn index* based

on the unusual circumstances of this case.  Traditionally, such a showing is made if the

requester's life or personal safety, or substantial *due process* rights, would be jeopardized

by the failure to process a request immediately.[7]  One year later, this remains an issue or

paramount importance.

---

[5] As an example, Caraballo has been denied access to his daughter and employment—liberty denials which might not occur if Caraballo had access to government documents and his own documents and video evidence seized by the government, which are exculpatory in nature.

[6] Plaintiff is prepared to provide to the Court proof of this spoliation and obstruction.  However, to protect a government employee informant/source, plaintiff can only provide this evidence to the Court *in camera* to prevent retaliation by DOS or their agents (government retaliation in this case is common place, just last week defendants sought to remove and fire numerous Afghan generals who refused to attack and shoot Idema and Bennett—dozens of Afghan officials and senior officers in the Karzai regime have previously been fired by the DOS for refusing to use deadly physical force against Idema and Bennett).

[7] *See, e.g., Neely v. FBI*, No. 97-0786, slip op. at 9 (W.D. Va. July 27, 1998) (granting expedited processing of FOIA request where plaintiff has pending motion for new criminal trial based on alleged false trial testimony and needs documents for proof), vacated & remanded on other grounds, 208 F.3d 461 (4th Cir. 2000); *Ferguson v. FBI*, 722 F. Supp. 1137, 1141-44 (S.D.N.Y. 1989) (need for documents, not otherwise available, in post-conviction challenge and upcoming

This plaintiff has been targeted for death on fourteen (14) separate occasions.  Mr. Idema has a $250,000.00 reward placed on him by Osama bin Laden and Gulbideen Hekmatyar, both most wanted terrorists.  As of today, in the last two years seven Afghan officers have been killed defending him against terrorist acts.  Twenty-one have been wounded, five have been seriously wounded.  A December 17, 2004 attack by Iraqi, Pakistani, and Arab terrorists resulted in two Colonels, and two officers killed within feet of plaintiffs, and three officers wounded during an 8 hour stand-off during which Idema, Bennett, and Banderas,[8]  held off 300 terrorists with barricades and improvised weapons.

In March 2006, a prison riot, during which dozens were killed and more than 40 wounded,[9] again put all three plaintiffs in serious jeopardy of assassination.  In spite of the fact that Idema, Bennett, and Banderas continue to survive the repeated violence in Afghanistan, this request continues to apprise this Court of the real and present possibility that a distant resolution of this case is improper, unwarranted, and a denial of *due*

---

criminal trial); *Cleaver v. Kelley*, 427 F. Supp. 80, 81 (D.D.C. 1976) (plaintiff facing multiple criminal charges 1550-51)); *Freeman v. United States Dep't of Justice*, No. 92-557, slip op. at 6 (D.D.C. Oct. 2, 1992) (expedited processing granted when scope of request limited, "Jencks Act" type material unavailable in state prosecution, and information useful to plaintiff's criminal defense might have been contained in requested documents);

[8] Lieutenant Rasuli Banderas, an Afghan CIA officer and Lieutenant in the Ministry of Defence remained with plaintiffs since being found innocent of all charges by an Afghan Court in December 2004. All were found innocent in February 2005, but not released.

[9] These are the real facts, in spite of "official" reports in the press that the casualty figures were roughly a dozen dead and twenty wounded.  Some of these articles defendants' counsel has comically relied upon as actual evidence (just as the Taliban Court used)—newspaper articles by reporters who were not present, and wrote them using third and fourth party hearsay statements.

*process*, and therefore plaintiff should be accorded all consideration possible under the FOIA laws. [10]

The Department of Justice, as a matter of administrative policy, has previously expedited FOIA requests when there was "widespread and exceptional media interest" in information which "involve[d] possible questions about the government's integrity which affect public confidence."[11]  In all such instances, however, the burden of demonstrating "a genuine need and reason for urgency in gaining access to Government records" fell upon the requester.[12]  There is no doubt that this case has been of "widespread and exceptional media interest" and that this interest involves "questions about the government's integrity which affect public confidence."

As an example, during a 2004 international press conference covered by more than 1000 newspapers and fifty television stations around the world a Department of State spokesman stated:

> "The US Government has no connection with these individuals, there are procedures underway in Afghan Courts; they'll have to make their case and prosecutors will have to make their case."
>
> Richard Boucher, DOS Spokesman, Daily Press Briefing, Washington, DC, July 20, 2004 (**Exhibit 4**; Excerpts)

---

[10] *See Also: Gilmore v. FBI*, No. 93-2117, slip op. at 1, 3 (N.D. Cal. July 26, 1994) (expediting request despite showing of due diligence and exceptional circumstances, based upon perfunctory finding that "[p]laintiff has sufficiently shown that the information he seeks will become less valuable if the FBI processes his request on a first-in, first-out basis").

[11] *FOIA Update*, Vol. XV, No. 2, at 2 (encouraging other federal agencies to adopt similar policies); *see also* Department of Justice FOIA Regulations, 28 C.F.R. § 16.5(d)(iv) (1999) (continuing such policy).

[12] *Open Am.*, 547 F.2d at 615-16; *see Edmond*, 959 F. Supp. at 3; *Ohaegbu v. FBI*, 936 F. Supp. 8-9 (D.D.C. 1996), <u>appeal dismissed for lack of prosecution</u>, No. 96-5261 (D.C. Cir. Nov. 22, 1996); *Lisee v. CIA*, 741 F. Supp. 988, 989 (D.D.C. 1990).

Plaintiff asserts that this statement was designed to mislead the public, place plaintiffs in imminent harm, and subject them to false press reporting.  This DOS spokesman, and the DOS defendant, knew, and had evidence and records that plaintiffs did have a connection to the American and Afghan governments.  This was discussed in emails, cables, and faxes between the Department of Defense, the Defense Intelligence Agency, and United States Embassy in Kabul.  These documents are the lynchpin of a successful defense in continuing Afghan Parliament hearings[13] and judicial conferences related to plaintiffs release from custody in spite of US government rendition.

State Department spokespersons also repeatedly stated the following, or various forms of the following:

In an email "Sent: Tuesday, May 10, 2005 4:07 PM" "From: Kirincich, Elizabeth A" at the State Department, and copied to "Foo, Jenny J" at the US State Department, Ms. Kirincich stated, in part:

> "I do want you to know that I followed up on our conversation and have **spoken with Russel Brown via email**.[14]  Russel explained that there is no political angle to your brother's case.  Unfortunately, Mr Idema has indicated that there is a conspiracy against him by the FBI.  **There is however, no evidence of this.[15]**
>
> The political section has never been, and is not now, a part of this case. The Embassy's Front Office is only marginally involved (now mostly because of the lawsuit that Mr. Idema filed against the Ambassador). The Front Office played a larger role earlier in the case in trying to figure out what Mr. Idema had done and in trying to verify his claimed "ties" to

---

[13] In fact, the Afghan Parliament Justice Commission found these men innocent of all charges **AGAIN** in June 2006, and issued an official report to that effect, which was classified by Karzai.
[14] There is no question that these emails exist as admitted by Kirincich, and therefore must be produced under the FOIA laws (the actual email exhibits have been previously introduced).
[15] Apparently the Department of State never considered the possibility of a document from the "secret" NDS file being photographed and in the possession of these plaintiffs.

the US Government - **it appears** that Mr. Idema was acting on his own with no US Government sanction.

Our embassy believes that there was **no pressure put on the courts for any verdict, guilty or not.**  That continues to be the case.  **This Embassy's view is that the trial was fair by Afghan standards.**[16]

Finally, **our embassy reports**[17] that the defense counsel interviewed all witnesses in private meetings between the judges, prosecution, and defense, though they may not have done so in court.

Finally, in answer to your question about evidence being confiscated, **the embassy is not aware that the FBI "confiscated" evidence as Mr Idema and his lawyers claim."**[18]  [All emphasis added]

This series of bold-faced lies is completely contradicted by the evidence.

In another email, dated Monday, May 16, 2005 4:37 PM, Elizabeth A. Kirincich, wrote to Richard Caraballo and Jenny Foo, another State Department employee:

"Mr. Caraballo,

Sorry I didn't get back to you sooner.  I did receive your email and we are preparing a reply.  We will need to clear the reply with other offices in the Department.  We will get back to you as soon as possible.

Thank you."

This series of emails shows several things.  First, that the State Department was in constant communication with the Kabul Embassy and other DOS offices.  Second, that higher officials in the State Department generated documents, such as the memorandums and/or notes and/or emails that "clear[ed] the reply with other offices in the Department,"

---

[16] Surreptitiously tape-recorded conversations of United States Embassy officials saying the exact opposite will be played at the hearing.

[17] Copies of these "reports" MUST be provided under the FOIA laws.

[18] Surreptitiously tape-recorded conversations of United States Embassy officials admitting they knew the evidence was confiscated will be played at the hearing.

presumably the State Department, not Kirincich's departmental office.  Third, that there were numerous documents and emails generated which are in real danger of being destroyed and which should be protected by this Court from further and continuing destruction.  Additionally, these emails go to the very heart of the FOIA.

Can a government agency communicate in secret and then destroy those secret communications when the communications are the very method in which the defendants determined the life of three American citizens in a foreign country convicted by a foreign justice system denounced by the United Nations[19] and presided over by a Taliban judge on the US Terror Watch list?

It would be impossible under United States law to conclude they can.

---

[19] On February 11, 2005, M. Cherif BASSIOUNI, the Independent Expert of the Commission on Human Rights On the Situation of Human Rights in Afghanistan, issued an initial United Nations report on the Afghan court and justice system.
Drafted for the UN's Office of the High Commissioner for Human Rights, the report was called "a scathing indictment" by the Afghan news services.  Run by judges with no formal education in law, and administered by people without a high school education, former Taliban officials and al-Qaida linked terrorists have made their way back into Karzai's government in a variety of areas, most importantly the legal arena.  As a result, terrorists are going free every day to kill again.  In the past 20 months more than 1800 captured al-Qaida and Taliban fighters, whose defeat was paid for with the blood of American soldiers, have been released by former Taliban Karzai officials.  Mr. Bassiouni, and a large entourage of attorneys and investigators met with Jack Idema and his team just ten days before the special initial report was issued.  His investigation later issued a UN report calling for Idema's Taliban first court judge, Abdul Basset Baktyari to step down.  Bassiouni allegedly voiced his belief that Baktyari should be charged with War Crimes.  More information on the Afghan legal system can be obtained at:
http://www.afghanbar.com
http://www.afghanbar.org/media/
http://www.afghanbar.org/media/melbournemedia/melbournearticle.htm
http://www.afghanbar.org/info/rule_of_law.html
http://www.afghanbar.org/media/ababusinesslawarticle/

Further, in newly discovered evidence, obtained from a woman that presented this document to His Excellency Sayed Jawad, Afghan Ambassador to the United States in Washington, DC, during a protest at the Afghan Embassy on September 11, 2006, Afghanistan's most senior diplomatic envoy has actually put IN WRITING, that plaintiffs are being held illegally and without any crime.  Nothing, <u>absolutely nothing</u>, is more telling of this case than this official document[20] (footnotes in document text clarify *Dari* language meanings), attached hereto as **Exhibit 5**; which states, in relevant part:

> Date:  4 August 2006[21]
> ***Embassy of the State of Afghanistan – Abu Dhabi***
> To Excellency Honorable Azimi Saheb,[22]
> Presidency of Honorable Supreme Court of Islamic State of Afghanistan:
>
> Honorably!  Bearer[23] of this letter is closest friend of us.[24]  Him along with the great people with the white beards[25] [the elders of our nation] will come there to congratulate you and in same time he [implies "they"] will talk about an American officer who has been living for long time in prison without any kind of crime and sin.
>
>> His Excellency Zekria Farid[26]
>> Ambassador to the United Arab Emirates[27]

---

[20] Not to lose sight of the AMERICAN FBI wanted Poster put out for these men (**Exhibit 6**).

[21] In Afghanistan, the most important and powerful letters between high officials, are always written in longhand if it is expected they will be honored.  Typewritten letters are for documents of lesser importance or from a lower rank to a higher rank.  Handwriting implies personal importance.

[22] H.E. Azimi is the newly elected/appointed/approved Chief of the Afghan Supreme Court and replaces Sheik Shinwari, the Islamic Fundamentalist who was pro-Taliban and a close friend of US Ambassador and Anti-Northern Alliance Pashtun Zalmay Khalilzad.

[23] The use of an unnamed Bearer in Afghanistan implies the highest sensitivity of the matter and the highest level of importance.

[24] Implying Massoud's United Front Military Forces, which Idema and Bennett were officers in.

[25] Verbally it has been stated that the bearer, who must remain confidential at this point, will bring a group of White Beards from each of the anti-Taliban tribes to the meeting.

[26] H.E. Zekria is the senior diplomat and highest diplomatic Mission of Afghanistan. Hence the words on the Ambassadors Official Stamp in *Dari*: "The Great ("*Kabir*" - the greatest, the great, the first) Embassy of Afghanistan. The "Great stamp" is used on letters of utmost importance.

[27] H.E. Zekria is also the Special Envoy to Oman.

Yet the State Department defendant, based on written "reports" issued a statement based on a one hundred percent patently false myth:

> MR. BOUCHER: Let's see what we have on that. Well, there were three U.S. citizens sentenced: two of them sentenced to ten years in jail; the third got an eight-year sentence. Our consular officials from the U.S. Embassy have attended the trial and the sentencing. **Note that the Afghan Government held the trial in accordance with Afghan law; the decision was handed down by an Afghan court after a full trial had been conducted.**[28] But that's about as much as I can say. We don't have a Privacy Act Waiver to say anything more.[29]    Yeah, Teri.
>
> QUESTION: But the process was acceptable to the U.S., fair and transparent, as far as--
>
> MR. BOUCHER: **As I said, it was conducted in accordance with Afghan law.**[30] **That's the rules that apply in that situation.**[31]
>
>> Richard Boucher, DOS Spokesman, U.S. Department of State,
>> Daily Press Briefing, Wednesday, September 15, 2004, 1:05 p.m. EDT

Plaintiffs have a FOIA right to copies of the supporting documents which are

contradicted by the Afghan Constitution, Penal Code, Criminal Code, United Nations,

---

[28] *Compare to;* Email of DOS official Elizabeth A. Kirincich, May 16, 2005 4:37 PM: **"This Embassy's view is that the trial was fair by Afghan standards."** *Infra,* page 10. Mr. Boucher carefully avoided saying the trial was "fair." (See Exhibit 4- State Dept Briefing excerpts)

[29] DOS did have special privacy waivers at the time [later revoked], and even without privacy waivers it never stopped the DOS from passing "secret" files to the Afghan court, contacting family and friends, or writing emails about the case details, all of which have been withheld.

[30] *Compare to;* Afghan Bar Association: "It is unfortunate that while this seminar was being conducted on of Afghanistan's biggest legal tragedies was occurring. Three Americans and three Afghan military officers were being tried by a former Taliban judge. No evidence was presented, no witnesses sworn in on the Koran, and all basic rights guaranteed by the Afghan Criminal Code were ignored during the trial. Not a single aid organization or human rights group spoke up about the illegal trial. Those attending this seminar also turned a blind eye. Until people lose their fear to speak out and defend truth and liberty Afghanistan will have no justice. While General Weston had an experienced translator for his seminar, the Americans sentenced to 10 years in prison, without any evidence against them, had several different translators, none of which properly translated the proceedings for them."   Available at: http://www.afghanbar.org/media/defendamerica/

[31] Obviously incorrect— Afghanistan had a new constitution and criminal code, neither of which were followed, but the rules that <u>had</u> to apply to American citizens were the Geneva Conventions and international treaties entered into by Afghanistan, all of which were violated.

and Geneva Convention (*see* **Exhibit 7**, Motion/Case Facts). This Court needs only scan the Afghan Motion to see that there were few less fair trials conducted in modern times.

The US Consul repeatedly told Caraballo's brother that "it was a fair trial."[32] The significance of this is that Brown and the government possessed documents— releasable under plaintiffs' FOIA requests— that showed it was not a fair trial, and even stated in writing, by US government officials, that it was not a fair trial, that the translation during the trial was false, that the presiding judge was a former Taliban Judge, and that exculpatory evidence had been seized by the FBI and stored at the US Embassy in Kabul.

The Department of State defendant has even refused to provide plaintiffs with their OWN consular files—no reason given—just a complete refusal to address the issue. This goes to the heart of this FOIA request where plaintiffs seek documents which conclusively prove that one or more defendants had actual knowledge, and wrote reports, documents, and memoranda, that plaintiffs' Afghan judge was a former Taliban Security Court judge who was on the US Terror Watch List and a Taliban official who supported terrorism. This is significant because prior to these DOS statements to the press, DOS defendants had those documents in their possession and therefore made intentionally false and deceptive statements to the international press. That, and plaintiffs' related subsequent FOIA requests, goes right to the spirit of why Congress enacted the FOIA.

---

[32] *Compare to;* Afghan Bar Association: "There are only approximately 162 defense lawyers at most in the entire country of Afghanistan. Few have more than a high-school education, many have not even completed high school. Most prosecutors have no formal training in law and until the system of bribery for justice is eliminated by reconstruction funds assisting the pay of defense lawyers and prosecutors, justice will never be found in Afghanistan." Available at: http://www.afghanbar.org/media/defendamerica/

The Electronic FOIA amendments generally codified these requirements for expedition of certain requests. Under them, agencies must have regulations providing for the granting of expedited treatment in cases of "compelling need" or "in other cases determined by the agency."[33] "Compelling need" is defined by law to encompass a situation in which withholding of the requested records "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual."[34] Additionally, the Electronic FOIA amendments specify that expedited processing will be granted when there exists, "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity."[35]

Therefore, a *Vaughn* **index** is not just clearly warranted and necessitated by the facts, but necessary to sharpen the issues and permit plaintiffs to identify the—as of now— undisclosed basis for the government's refusal to provide documents and certain agency's complete silence on the issues before this Court.

**WHEREFORE**, plaintiff Idema requests this Honorable Court require defendants, and each of them, to provide plaintiff with an appropriate *Vaughn* index within 14 days of the date of the Court's order, and such other relief set forth in plaintiff's proposed order.

---

[33] 5 U.S.C. § 552(a)(6)(E)(i); *see FOIA Update*, Vol. XVII, No. 4, at 10.
[34] 5 U.S.C. § 552(a)(6)(E)(v)(I).
[35] *Id.* § 552(a)(6)(E)(v)(II); *see also* 28 C.F.R. § 16.5(d) (1999) (specifying procedures for expedited processing, including when there is "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information").

Respectfully submitted this 17th Day of September 2006,

_____S/_____
John Edwards Tiffany,
*Attorney* (JT7322) *For Idema*
The Robert Treat Center
50 Park Place, 10th Floor
Newark, New Jersey 07102
(973) 242-3700 Tel
(973) 242-3799 Fax

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing **Vaughn Motion** and **Memorandum of Law** in support of Plaintiff's VAUGHN MOTION and PROPOSED ORDER were served on all parties either by ECF or by depositing a copy of same in the United States mail, first class, postage paid, on September 19, 2006, for service, addressed as follows:

PETER D. KEISLER, Assistant Attorney General
KENNETH L. WAINSTEIN, United States Attorney
ELIZABETH J. SHAPIRO, Assistant Branch Director
ORI LEV, DC # 452565, Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, Washington, DC 20044
20 Massachusetts Ave., NW, Rm 7330,
Washington, DC  20001
(BY ECF)

Edward Caraballo                       Captain Brent Bennett
*Co-plaintiff*                         *Co-plaintiff*
1941 Muliner Avenue                    c/o US Consul
Brooklyn, NY 10462                     US Embassy Afghanistan
                                       6180 Kabul Place
                                       Dulles, VA  20189-6180

This 19th Day of September 2006.

_____S/_____
John Edwards Tiffany

# REFERENCED EXHIBITS LIST

| Exhibits | Description | Page |
|---|---|---|
| Exhibit 1 | Email Statements of Lieutenant Colonel "Mike"…………………… | 2 |
| Complaint* | Exhibit 1 to Original Complaint referenced…………………… | 3 |
| Exhibit 2 | Jackie Rios FOIA Request Denial……………………….……….. | 5 |
| Exhibit 3 | FBI Evidence Receipt: *Seized Documents, videos and pictures*.. | 6 |
| Exhibit 4 | State Department Briefing Transcripts…………………………. | 8, 13 |
| Exhibit 5 | Letter From Senior Afghan Ambassador……………………… | 12 |
| Exhibit 6 | FBI Wanted Poster; example of various posters used…………. | 12 |
| Exhibit 7 | Afghan Motion; Violations of Law Overview………………… | 14 |

\*   In record, not included herewith.

**EXHIBIT # 1**

**Note:  All emphasis in Original**

-------- Original Message --------
Subject:
From: "Mike & Stacey" REDACTED
Date: Sun, August 06, 2006 5:00 am
To: REDACTED

Family and Friends of Jack:

I just returned from a tour in Afghanistan.  I spent 9 months at Camp Eggers, Kabul, and traveled to Pol-e-Charki Prison, on numerous occasions to visit Block IV which is being renovated.

As a result of my attempts to learn Dari, I made a point of talking to the Pol-e-Charki guards when I visited other parts of the prison.  While I didn't get to meet Jack, I did ask the guards if they knew Jack and what they thought of him.

**100% of the time**, the guards told me they considered Jack a freedom fighter and he had their full respect.  The Afghan people themselves are the best indicator of whether Jack was a hero or a terrorist.

Mike

-----Original Message-----
From: "Mike & Stacey" REDACTED
Date: Sun, 13 Aug 2006 15:52:57
To:"Tiffany" <jet4444@verizon.net>
Subject: Re: Jack Idema

John:

I am a Reserve Judge Advocate (and civilian prosecutor) and was in Afghanistan working on legal issues pertaining to the renovation of Pol-e-Charkhi Prison Block IV.

Have any Congressionals been filed on Jack's  behalf?  I had heard of Jack through Robin Moore's book, the Hunt for  Bin-Laden, before I arrived.
REDACTED

Mike

**Exhibit  1**

**EXHIBIT # 2**


**Standard Denials Being Issued Nationwide by Department
of State and other Defendants for all FOIA Requests
Concerning Jack Idema and his Team**


**Exhibit   2**



**United States Department of State**

*Washington, D.C.* 20520

July 19, 2005
Case Number: 200502727

Ms. Jackie Rios
450 Robeson
Fayetteville, NC 28301

Dear Ms. Rios:

This is in response to your Freedom of Information Act (FOIA) request, dated June 23, 2005 for copies of documents regarding FBI agents assigned to the Kabul Embassy and information pertaining to the Afghan government.

Before we can proceed with the processing of your request, we need a valid "Third Party" authorization and additional information described below.

**Fees:** The FOIA requires agencies to assess fees to recover the direct costs of processing requests, unless a fee waiver has been granted.

We suggest that you contact the Federal Bureau of Investigation for the information regarding FBI agents assigned to or working out of the Kabul Embassy. Accordingly, you should direct this portion of your request to:

Federal Bureau of Investigation
David M. Hardy
Chief, Record/Information Dissemination Section
Records Management Division
935 Pennsylvania Avenue, N.W., Room 6296
Washington, D.C. 20535-0001

*Office of Information Programs and Services*
*U.S. Department of State SA-2*
*Washington, DC 20522-8100*
*Web site: foia.state.gov*

*Inquiries:*
*Phone: 1-202-261-8314*
*FAX: 1-202-261-8579*
*email: FOIAStatus@state.gov*

- 2 -

Based upon the information that you have provided, we have placed you in the all others requester category. This category requires us to assess search time after 2 hours/duplication costs after the first 100 pages. (see 22 CFR 171, enclosed)

You have indicated your inclusion in a category different than the one indicated above. Please forward the information requested on the enclosed sheet titled "Requester Categories" to substantiate your inclusion in a particular category of requester.

You have stated your willingness to pay the fees incurred in the processing of this request up to $100.00.

**Third Party Requests:**  In general, under the provisions of the FOIA and Privacy Act, access to information about private individuals cannot be given to unauthorized third parties absent the individuals' written consent.

The State Department requires that written consent be in the form of a <u>signed notarized</u> statement from the individual(s), authorizing the Department of State to release information to the other party.  The statement should bear the **original signature** of the individual and <u>**original seal of the notary,**</u> and be dated within six months of the date of the request.

In lieu of notarization, the individual may make the following statement:  "I declare, certify, verify or state that, under penalty of perjury under the laws of the United States of America, the foregoing is true and correct." Such a statement must be forwarded to us **with an original signature** (faxed photocopies cannot be accepted.)

*Office of Information Programs and Services*
*U.S. Department of State  SA- 2*
*Washington, DC 20522-8100*
*Web site: foia.state.gov*

*Inquiries:*
*Phone: 1- 202- 261- 8314*
*FAX: 1- 202- 261- 8579*
*email:  FOIAStatus@state.gov*

-3-

For living individuals, please provide written consent (see above), or advise us that you are unable to provide such an authorization. Requests can be processed without consent, but release of records may be severely limited to protect the privacy of the subject individuals.

For deceased individuals, unless the death has been widely reported, please provide proof of death, e.g. newspaper obituary or a copy of a death certificate, or advise us that none will be forthcoming.

**Information to Identify Records:** The Department of State is responsible for formulating and executing U.S. foreign policy and primarily maintains records dealing with U.S. foreign relations. The Department also maintains records of applications from U.S. citizens for U.S. passports and visa requests from non-citizens to enter the U.S., records on consular assistance provided to U.S. citizens abroad, and records of Department employees.

As the Department of State consists of hundreds of offices and overseas posts, with many different filing systems, your request should be specific, detailed, and include as much of the following as might be relevant:

   --valid-third party authorization.

   --circumstances which lead you to believe that the Department of State would have this information.

   --detailed description of the type of records sought.

Your request has been closed in our system. If, after noting the information cited above, you wish to pursue this request, please send to us a new FOIA request, which would include a valid third-party authorization and additional information needed, as described above.

---

*Office of Information Programs and Services*
*U.S. Department of State SA-2*
*Washington, DC 20522-8100*
        *Web site: foia.state.gov*

*Inquiries:*
*Phone: 1-202-261-8314*
*FAX: 1-202-261-8579*
*email: FOIAStatus@state.gov*

- 4 -

For further communications, please note our contact information at the bottom of this page. We can provide faster service if you include the case number of your request in your communications with us.

We are pleased to be of service to you.

Sincerely,

Jerry Allsbrook Jr.
Requester Communications Branch

Enclosures: As stated.

Office of Information Programs and Services
U.S. Department of State  SA- 2
Washington, DC 20522-8100
Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8314
FAX: 1- 202- 261- 8579
email: FOIAStatus@state.gov

**EXHIBIT # 3**

**FBI TO AFGHAN NDS EVIDENCE RECEIPT**

**Dari to English Translation Not on Original**

## FBI Signature On Dari Evidence sign-out Sheet Dated July 24, 2004



- 'Cards -- 7 pieces'

[This refers to ID Cards]

- 'Pictures -- 3 pieces'

[This refers to 3 cases of pictures]

- 'Paper of E-mail'

[This refers to hundreds of emails between Idema and the DOD, FBI, CIA, ISAF, and other similar organizations]

- 'File in booklets and notes.'

[This refers to about 30 intelligence files containing highly exculpatory documents]

- 'Chair that has arms with all the documents in the bags.'

[This refers to a chair with bags of documents and photos sitting on it, also evidence]

- 'More than 500 pieces of paper which are written in English.'

[This refers to about 30 intelligence files containing highly exculpatory documents]

'CPO, two altogether.'

[This refers to laptop computers with highly exculpatory evidence on them]

Signature in English of 'Kevin Thuman'
[FBI Special Agent- Kabul]
Dated, July 24, 2004

# Exhibit   3

# EXHIBIT # 4

## Excerpts of Relevant State Department Briefings

*****************************

Daily Press Briefing
**Richard Boucher, Spokesman**
Washington, DC
July 20, 2004

**TRANSCRIPT:** 12:35 p.m. EDT

Andrea.

**QUESTION:** Going to Afghanistan. What is the State Department's response to the claims made by the three American soldiers who claim to have been working for Special Forces in putting together this ad hoc prison in Afghanistan? Is there anything to their --

**MR. BOUCHER:** I don't -- it's not for the State Department to respond to, I'm afraid, and we don't -- not in -- have no connection with these individuals. The U.S. Government has no connection with these individuals. There are procedures underway in Afghan courts. They'll have to make their case and prosecutors will have to make their case. And as far as any connection with U.S. military forces, as I've said, there's no U.S. Government connection, but any further questions about Special Forces or whatever you want to speculate on have to be answered at the Pentagon.

Adi.

**QUESTION:** To Iraq?

**MR. BOUCHER:** Yeah.

**QUESTION:** What's clear in recent weeks is the fact that terrorists and insurgents are targeting not just the leaders of the new Iraqi government, but the mid-level officials as well. So my question to you is, is there -- what plans are there to protect these mid-level people? There are obviously protection given to the top-level people -- bodyguards, et cetera, et cetera -- using U.S. contractors or other means. Are the facilities that you have in Jordan, for example, that you are setting up to train the new Iraqi Civil Defense Corps, are they going to be used to help protect the mid-level people?

**MR. BOUCHER:** Well, first, we're not in a position to talk about any specific individual's protection or the kind of protection that we can provide to different officials. But the whole issue of security is being done as a joint effort with the Iraqis. They have primary responsibility for security and have asked the coalition forces to help them establish security in their country and we do that in a lot of different ways. Sometimes it's Iraqi forces, sometimes it's Iraqi police, Iraqi Civil Defense forces, and foreign coalition forces that help them in that regard.

So there's a lot of different ways of trying to protect people who are stepping forward to participate in the organs of government, stepping forward to participate in different activities. Some of these bombings have been directly against the Iraqi police, and we are training a lot of Iraqi police in Jordan, and there are still a lot more people who are stepping forward and saying they want to help with stability in Iraq, they want to join the police force in Iraq, they want to be part of establishing order in their own country. And it's people like that, ultimately, that will provide the kind of security for that society that they need.

(The briefing was concluded at 1:20 p.m.)  DPB # 118

*********************************

# Exhibit   4

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*EPF402 09/16/2004

Transcript: State Department Noon Briefing, September 15 (Release of International Religious Freedom Report/Saudi Arabia, Iran, Sudan, Pakistan, Russia, Afghanistan, Israel/Palestinians) (4680)

State Department Spokesman Richard Boucher briefed reporters September 15.
Following is the transcript of the State Department briefing:
(begin transcript)

U.S. Department of State
Daily Press Briefing Index
Wednesday, September 15, 2004
1:05 p.m. EDT

BRIEFER: Richard Boucher, Spokesman
U.S. DEPARTMENT OF STATE
DAILY PRESS BRIEFING
WEDNESDAY, SEPTEMBER 15, 2004
(ON THE RECORD UNLESS OTHERWISE NOTED)

1:05 p.m. EDT

MR. BOUCHER: Good afternoon, ladies and gentlemen. It's a pleasure to be here. I don't have any announcements or statements for you today, so I'd be glad to take your questions. I'm sorry I'm late.

[EXCERPT]:

QUESTION: Richard, what are your reactions to the final verdict in the trial in Kabul, Afghanistan with three Americans?

MR. BOUCHER: Let's see what we have on that. Well, there were three U.S. citizens sentenced: two of them sentenced to ten years in jail; the third got an eight-year sentence. Our consular officials from the U.S. Embassy have attended the trial and the sentencing. **Note that the Afghan Government held the trial in accordance with Afghan law; the decision was handed down by an Afghan court after a full trial had been conducted.** But that's about as much as I can say. We don't have a Privacy Act Waiver to say anything more.

Yeah, Teri.

QUESTION: But the process was acceptable to the U.S., fair and transparent, as far as --

MR. BOUCHER: **As I said, it was conducted in accordance with Afghan law. That's the rules that apply in that situation.**

QUESTION: Oh, okay.

MR. BOUCHER: Yeah, sir.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(The briefing was concluded at 1:30 p.m.) (end transcript) (Distributed by the Bureau of International Information Programs, U.S. Department of State. Web site: http://usinfo.state.gov) Full text at:

**EXHIBIT # 5**

**Letter of the Afghan Ambassador- Jack Idema is Innocent**



**Exhibit  5**

### TRANSLATION OF THE LETTER EXHIBIT
### FROM THE SENIOR AMBASSADOR AND ENVOY
### FOR THE ISLAMIC STATE OF AFGHANISTAN

## Translation Starts:

Date:  13/5/85   [4 August 2006][36]

## *Embassy of the State of Afghanistan – Abu Dhabi*

To Excellency Honorable Azimi Saheb,[37]
Presidency of Honorable Supreme Court of Islamic State of Afghanistan:

Honorably!  Bearer[38] of this letter is closest friend of us.[39]  Him along with the great people with the white beards[40] [the elders of our nation] will come there to congratulate you and in same time he [implies "they"] will talk about an American officer who has been living for long time in prison without any kind of crime and sin.

I am expectant about [literal translation; which can also be "expecting"] the release of this officer because it is necessitated by our Afghan hospitality, that you order and command generous attention[41] to this.

His Excellency Zekria Farid[42]
Ambassador to the United Arab Emirates[43]

## Translation Ends.

---

[36] In Afghanistan, the most important and powerful letters between high officials, are written in longhand if it is expected they will be honored.  Typewritten letters are for documents of lesser importance or from a lower rank to a higher rank.  Handwriting implies personal importance.

[37] H.E. Azimi is the newly elected/appointed/approved Chief of the Afghan Supreme Court and replaces Sheik Shinwari, the Islamic Fundamentalist who was pro-Taliban and a close friend of US Ambassador and Anti-Northern Alliance Pashtun Zalmay Khalilzad.

[38] The use of an unnamed Bearer implies the highest sensitivity of the matter and the highest level of importance

[39] Implying Massoud's UFMF, United Front Military Forces, which Idema, Bennett, and Banderas were officers in.

[40] Verbally it has been stated that the bearer, who must remain confidential at this point, will bring a group of White Beards from each of the anti-Taliban tribes to the meeting.

[41] The phrase "generous attention" in *Dari* means that it should be one of your first priorities, if not the first priority of your office (in this case, the Office of the Chief of the Supreme Court).

[42] H.E. Zekria is the senior diplomat and highest diplomatic Mission of Afghanistan. Hence the words on the Ambassadors Official Stamp in *Dari*: "The Great ("*Kabir"* - the greatest, the great, the first) Embassy of Afghanistan. The "Great stamp" is used on letters of the utmost importance.

[43] H.E. Zekria is also the Special Envoy to Oman.

**EXHIBIT # 6**

**One of Several Versions of the Wanted Poster Allegedly Printed by the FBI**



WANTED BY THE FBI ON A SERIES OF CRIMINAL CHARGES

## JONATHAN KEITH IDEMA

*ARMED AND DANGEROUS*
**SECURITY FORCES SHOULD DETAIN IF ENCOUNTERED**
**WANTED**
**FOR**
**INTERFERRING WITH MILITARY OPS/FORCE PROTECTION**
**CALL BDOC (DSN 237-1025)**
**AND**
**C2X (DSN 237-1303)**
**IMMEDIATELY**

### APPROACH WITH FORCE

IDEMA is well connected within the Afghan society and he has dealings
with key military, political and local authority figures, he has been
working in Afghanistan for approx 3 years and has traveled extensively
within the country.  IDEMA is wanted by the FBI.  He is known to travel
with large and heavily armed soldiers from the illegal Northern Alliance.
**IF SEEN CONTACT THE FBI IMMEDIATELY.**

# Exhibit  6

**EXHIBIT # 7**

**Overview of Violations of Afghan and International Law
in Contradiction of Department of State Briefings by
Richard Boucher.**

**The Requested State Department Documents are Believed
to Outline These Violations of Law, Which is Why They
Are Being Withheld in Violation of the FOIA.**

**Note: This document was filed in the Afghan Courts, was
personally supplied to the DOS defendants, and has been
in the possession of the US State Department since it was
filed.  Defendants withheld these laws, in spite of repeated
requests by plaintiffs, for months while the DOS allowed
an illegal trial to proceed.**

# Exhibit  7

## APPEALS COURT OF AFGHANISTAN
## NATIONAL SECURITY DIVISION

NDS (*Amniat*),
　　　　*vs*.

Mr. Jack, Mr. Brent,
Mr. Ed, Major Ezmerai Amin,
Lt. Wahid Rasuli, Syhail Shohabi,
And, Sherzai Ahmadi,
　　　　　　　　Defendants.

## MOTION IN LIMINE TO EXCLUDE EVIDENCE OBTAINED AND/OR PRESENTED IN VIOLATION OF THE LAW & MOTION TO DISMISS BASED ON ILLEGAL GOVERNMENT ACTIONS

**To the Honorable Judges Presiding:**

The accused, as undersigned below, and having filed a joinder in all previous defense motions, hereby move this Court for an order to exclude, all unsworn statements of alleged victims based on perjury and other violations, unsworn witnesses, and statements taken from the accused through torture and illegal drug rendering. Further to exclude all other physical evidence illegally obtained from any consideration by this court and use at trial. Further, to immediately dismiss all criminal charges pending based on new evidence of actual innocence. In support thereof:

BACKGROUND FACTS:

Defendants were illegally convicted of all charges in the Primary Court on September 16, 2004 and sentenced to lengthy terms of imprisonment. Thereafter, defendants appeared in the Second Court (the Afghan Court of Appeals of the Supreme Court of Afghanistan), and engaged in several closed door hearings. In November 2004, defendants were granted a Trial *de novo* (a completely new trial) and the convictions were declared null and void.

Over the next 45 days, several additional evidentiary hearings were held. In the course of those closed door hearings, the Court of Appeals heard sworn testimony for the first time in the process (other than the sworn testimony of Mr. Jack which was ignored by the Primary Court Chief Judge). As a result of that sworn testimony, from government officials, Ministry of Justice Police Officers, and Ministry of Defense officers, the Court of Appeals found all four Afghan defendants innocent and ordered the release of Major Ezmerai, Lt. Rasuli, Sohail, and Sherzai. Although the Afghan

defendants requested the Court delay their release until all seven were freed, a colloquy followed between Mr. Jack and the Court during which it was decided that all would be released with the agreement of Mr. Jack. However, voicing strong objections, Lt. Rasuli, a Ministry of Defense employee, still refused to be released and opted to stay with the American defendants until such time as the release of all defendants. Mr. Jack, with the unanimous approval of the Court, agreed that Lt. Rasuli would not be released and would remain with the group. Hearings were subsequently suspended between December 7 and December 14, 2004 at the request of Mr. Jack and due to other Court business related to this case.

Over the next 30 days defendants were prepared to proceed, but it appears the American FBI has again successfully delayed this case for another 30 days and has still refused to return the evidence. The US government continues to withhold evidence

This case is ready to continue with the trial *de novo* based on the merits and new evidence. Further, due to exculpatory evidence uncovered by, and subsequently heard by this Honorable Court, additional hearings are required.

However, as much as the accused defendants appreciate the efforts and fairness exhibited by this Honorable Appeals Court, there still remains the issue of multiple violations of the *Afghan Interim Criminal Code* by the Primary Court, the NDS, and specifically, Judge Abdul Basset Bakhtyari. The *Afghan Interim Criminal Code*, hereafter referred to as the Interim Criminal Code or Criminal Code is unbending, inflexible, and specific in its' design and details of how a criminal investigation and trial must be conducted. However, in spite of the clear text of the Criminal Code in both English, *Dari*, and *Pashtu*, Judge Bakhtyari constantly ignored the Code, and stated on the record that the Criminal Code is just a guideline, and holds no valid force. **This is a complete misstatement of the law and facts.** The *Rule of Law*, a phrase so often yelled out in court by the Primary Court *Saranwal* (prosecutor) Naeem Dawari, is not a guideline subject to a Judge's whims. It cannot be superseded. It cannot be altered or modified. It cannot be ignored, and it cannot be violated. To violate the rules of the Criminal Code is in itself **a violation of law subject to punishment enforced against the government officials propagating the violation or violations.** The government is neither at liberty to violate it or ignore it. To do so results in only one possible end. The dismissal of the case in the interest of justice.

Rights, guaranteed by the Afghan Constitution and National Law, cannot be trampled. The Criminal Code, like an chicken's egg, cannot be broken by the government, and then once broken, put back together again and served for breakfast to the defendants. Simply put, the Rule of Law, once broken, is permanently broken.

Therefore, this Honorable Court has no choice under the law other than to dismiss the case in the interest of justice. The only other alternative is to exclude all NDS evidence- specifically statements,[1] and provide discovery of, and access to, exculpatory evidence, and evidence illegally removed by the American FBI, for use during the new trial. And then, the Court must hold a full and fair public trial.

---

[1] The statements are comprised of unsworn lies anyway, and this Court now has evidence proving that.

This alternative would provide such a compelling case for a verdict of absolute innocence, that defendants actually prefer the second alternative and a final decision on the actual merits in the case. Only through this venue can the accused regain their loss of reputation, freedom, and morality which has been unduly destroyed in the international community as the result of false accusations by international terrorists, by unscrupulous NDS officials who received money from third parties to prosecute this case, by judges and prosecutors who were former employees and followers of the Taliban terrorist regime, and by the American FBI which sought to discredit various factions within the US and Afghan governments. Therefore, the accused request this Court review the following conduct by the Primary Court, the Primary Court *Saranwal*, and the American FBI:

A.  **Violation of Article 15;** which states that the **arrest and trial are null and void** and so declared when the procedure of the <u>Criminal Code</u> has not been followed. This requires the immediate dismissal of all charges. This is perhaps the most important Article of Law quoted in this case because it gives this Appeals Court the power to dismiss all charges and release all parties based on the intentional <u>Criminal Code</u> violations of Judge Bakhtyari, *Saranwal* Dawari, and the American FBI. This Court has a moral, ethical, and legal obligation to dismiss this case under the law based on *Article 15* of the <u>Criminal Code</u>.

B.  **Violation of Article 16;** which states that any and all violations of procedural provisions of the <u>Criminal Code</u> bring about the invalidity of the procedure if they are denounced by the interested party. And further, that when that denunciation is made during investigation or trial the court has the right to make a decision, and must exercise that right to dismiss the case or will be overturned by the Courts of Appeals or the Supreme Court. The accused did make these denunciations, and filed a written motion outlining the violations, and now this Appeals Court must dismiss the case or it will be removed to an international tribunal or court, which will dismiss it under international law and treaties signed by this government.

C.  **Violation of Article 4, #1**; because <u>Article 4</u> assumes all accused are innocent until proven guilty, it limits the deprivations of human rights to the need for collecting evidence. In other words, the Criminal Code actually allows for the torture of suspects to collect leads, but only for 24 hours (<u>*see*</u>: Article XX).

   1.  However, in the case of Mr. Jack, the torture inflicted was not for any investigative purpose, it was merely for fun. Five others were also tortured to varying degrees, including; electrocutions, burnings, and beatings.
   2.  The physical evidence of the torture was well documented by the U.S. Embassy Consulate Officer, and by four different doctors. Formal complaints

were lodged by the U.S. government.  Jack requested the formal complaints to
be suspended because the abuse increased each time a complaint was made.

3. These deprivations of human rights also require a dismissal of charges for
   violations of law by officials.

**D.**   **Violations of Article 5, #4;** Article 5 states in paragraph 4; the suspect and the
accused shall <u>not</u> undergo intimidations or any form of physical or psychological
pressure.

1. However, Mr. Jack, Wahid, Ezmerai, and Sohail all underwent excessive
   abuse and torture in the first court, as evidenced by statements under oath and
   documents which were presented to this court *in camera*.
2. All accused were threatened by NDS officials and foreign agents if they did
   not make written statements.  The First Court previously stated that merely
   because our "alleged" victims **claimed** they were abused the Court was forced
   to let them free under the law.  It is clear on the record that the reason for this
   was because Judge Bakhtyari and Malawi Sidiq were close friends and it is
   indisputable that both were Taliban officials.  It is also now indisputable that
   the prosecutor was a former Taliban official.
3. As an example, Sherzai Ahmadi testified in the Court of Appeals during the
   December hearings, that he was not only tortured and beaten by NDS, but was
   given narcotics (Diazepam/Valium) to render him helpless while NDS forced
   his thumbprint on multiple written confessions (his is in fact, illiterate).
4. In summation, in accordance with <u>Article 5</u>, the statements of all accused may
   not be used, read from, quoted, or considered, and all criminal charges should
   be dismissed for those tortured.

**E.**   **Violation of Article 5, #5**; which states that all statements shall be made in a
condition of absolute moral freedom.

1. Defendants were tortured, threatened, beaten, burned, electrocuted, and
   drugged.  Some defendants were unable to resist the torture and made
   statements during the torture or under the influence of psychotropic drugs.
2. These statements were coerced and therefore can not be used or considered.

**F.**   **Violation of Article 5, #6**; which states that the accused have a right to abstain
from making any statement to the police.

1. Not only were <u>none</u> of the accused informed of this right, they were actually
   threatened with beatings, hangings, and electrocution if they refused to sign
   the statements.
2. Therefore, the statements can not be used.

G.  **Violation in Article 5, #7**; which states the police, the *Saranwal*, and the Court, are **duty bound** to clearly inform the accused that they have a right to remain silent, right to representation at all times by defense counsel, <u>and</u> right to be present during searches, examinations, and trial.

1.  No NDS agent, police officer, or FBI agent, <u>EVER</u> informed any of the accused as to these rights, nor did the *Saranwal*, nor did the Court. In fact, defendants have repeatedly asked for counsel, asked and demanded to be present during searches and examinations, and refused to give statements until they were either tortured or threatened or drugged. Jack and Ezmerai[2] refused to give statements even after brutal extensive torture.
2.  These rights in the United States are known as the Miranda Rights, established more than thirty years ago in the case of *Miranda vs. California*. They are guaranteed by International Law, by the Geneva Conventions,[3] and by the Afghan Interim Criminal Code. They are un-waiverable. In all cases the failure to advise an accused of these rights invalidates all statements, and in cases such as this, requires their release.

H.  **Violation of Article 19;** which states; "A suspect or the accused is entitled to have a free defense attorney appointed to him…"

1.  As stated in several other motions filed in the Primary Court, the appointment of a defense attorney is not a privilege under the law, it is a right, and can not be denied upon petition of the accused.
2.  The failure of the Court to appoint a defense lawyer when requested to do so was a severe violation of the Code. Judge Bakhtyari knowingly and intentionally violated this rule.

I.  **Violation of Article 20;** which states; "The accused who does not know the language used during the investigations and trials…shall be given an interpreter…"

1.  This does not say "may" be given an interpreter. It says "shall," meaning must be given one.
2.  Article 20 states the interpreter shall be given to the accused for the purposes of 1) explaining the charges, 2) explaining the indictment, 3) assisting in interrogations of witnesses, and 4) confrontations of witnesses, the *Saranwal,* and the evidence.
3.  Each of the Americans requested an interpreter at each Primary Court hearing, at each meeting, and at each trial appearance. We lodged formal complaints

---

[2] Major Ezmerai's burns from electrocution lasted for six months, and scars are still evident.
[3] Jack, on behalf of all subordinates, asserted POW protected status under the Geneva Convention of 1949 on the second day of capture, and no defendant has ever waived protected status since that time.

with the United States Embassy, the Court, the Office of President Karzai, the Geneva Convention Central Information Bureaux in Switzerland for POWs, and with the Red Cross Legal Division. Each time we were assured by Judge Bakhtyari that the issue was being addressed. In fact, Mr. Brent and Mr. Jack requested their own interpreter on at least 7 (seven) different occasions in open court.

4. Throughout the trial we had no idea of what was being said– in other words, the events and testimony of the trial were being conducted in secrecy – because we did not know what was being said. This not only violates Article 20, but it also violated at least six other Articles that "require our presence" at every stage of the proceedings. If you do not understand the language being spoken, then you are not effectively present, which is another violation of the <u>Criminal Code</u>.

5. Further, the interpreters that were present in the Primary Court neither translated the entire statements nor translated our words correctly. Those translators in the Primary Court were used solely for the Court's convenience and for the press by Judge Bakhtyari. They were not defense interpreters. The only interpreter[4] that actually did his job, and tried to translate correctly, was promptly fired by Judge Bakhtyari and threatened with arrest if he returned to court.

6. Additionally, it is clear and known by the international community present that the interpreters were in fact altering the statements of both sides by concealing prosecution statements from us, and by altering the statements of the accused and of prosecution witnesses. As an example, the court's "former" communist regime official, who acted as a translator, stated in English that prosecution witnesses said they were hung upside down and doused in boiling water. This was a complete outright lie. These statements were never said; only used to incite the international press. When our own translator, Lt. Rasuli, a Ministry of Defense translator attempted to inform Mr. Jack that the translation was incorrect and the translator was intentionally lying, Lt. Rasuli was later beaten, threatened with execution, and kept in full body chains for thirty days.

7. This was a severe violation of the <u>Interim Criminal Code</u>, and requires immediate dismissal and misconduct charges against Judge Bakhtyari and the Primary Court.

J. **<u>Violation of Article 23, #3</u>**; which states the *Saranwal* is duty bound to evaluate and make available exonerating or exculpatory evidence.

1. Although exculpatory evidence exists, the defense has not been allowed to access it. We have never seen the files (except when waved in the air in court

---

[4] This interpreter was provided by the US Embassy, and only worked for two hours, and was fired by Bakhtyari.

by Judge Bakhtyari), never been given a copy of the file (even though this has been promised to us on at least four occasions), never been allowed to copy the file (even though our American attorneys were promised a copy by Judge Bakhtyari), and never allowed to use the file in court proceedings. This was in complete violation of the law.

2. Additionally, the American FBI seized evidence, destroyed evidence, and concealed evidence. In the first incident, the American FBI confiscated all physical evidence in the case. This occurred in mid-July 2004. The FBI, which has NO JURISDICTION in this case, and NO AUTHORITY to view, examine, or take the evidence, removed extensive evidence from the NDS evidence room. This evidence included approximately 200 videotapes, 500 pages of documents, more than forty rolls of film. Even if the FBI were allowed to view the evidence, under the law it must be done in the presence of the accused. Instead, the evidence was removed. Once the evidence was removed and in the illegal possession of the American FBI, videotapes were erased, documents either destroyed or lost (they were never returned) videotapes missing, and all film missing, along with laptop computers and hundreds of emails between US government officials and the accused (and also Afghan government officials, including the offices of the Vice-President and President himself). After much argument in court, and extensive pressure by Caraballo's defense lawyer, the FBI returned SOME of the evidence during an August trial. Still missing were videotapes, documents, all film, and the laptop computer and emails. All of the evidence missing was completely exculpatory in nature and would have provided a complete defense of the accused.

3. During the Appeals Court process evidence continued to disappear. Prior to that, the videotape in which Minister Qanooni, a member of the National Security Council, authorized the arrest of one of his employees, turned up missing the day after a portion was played in Court proving the initial statements of the accused. Then, in a completely illegal and unwarranted interference in the appeals process, the FBI AGAIN CONFISCATED the evidence on or about November 27, 2004, just one week before the accused were to use the remaining videotapes for their defense.

4. Because ALL of the exculpatory evidence is now missing, this Court has no choice under the law but to dismiss the entire case and find the FBI guilty of negligence, witness tampering, destruction of evidence, and theft of evidence.

K.  **Violation of Article 31, #1**; which states the police have a maximum of 24 hours to inform the accused of the reason for arrest and interrogate them.

1. No interrogations took place for more than 72 hours, only torture took place. Interrogations continued for approximately 90 days.

2. NDS officials, and General Babajan told the accused that the FBI and CIA only wanted to talk to us. The CIA denied being involved at all (which is a fact, the CIA had <u>no</u> knowledge of this incident). It is now clear from statements of officials which have testified during closed door sessions, that the entire matter was orchestrated solely by the FBI, and no other agency, American or Afghan. Further, American FBI agents were present at NDS when American and Afghan detainees were interrogated and severely tortured repeatedly during questioning, an egregious violation of rights by "actors" of the FBI and FBI.

3. Therefore, all evidence obtained after 24 hours <u>must</u> be excluded from evidence and this includes all statements made by the Afghan accused, and all other statements in the file, both signed and unsigned.

L. **Violation of Article 32, #3;** which states that defense counsel and the accused have the right to be present during all searches, seizure of objects and documents, inspection of premises, taking of photos and interrogations, and all investigation/questioning phases.

1. This is guaranteed by <u>Article 38</u> of the <u>Code</u>. But in this case <u>none</u> of the accused were allowed to be present during any of these activities.

2. As an example of how this could provide the NDS with false evidence and false statements, Mr. Jack was not allowed to be present for the questioning of Defendant Sherzai. In Court the *Saranwal* told the Court that Sherzai told the police that Jack threatened to kill him if he ever discussed the terrorists. However, Sherzai, says he never said this.

3. In fact, Sherzai testified twice under oath during the new Appeals Court trial, that he was beaten, he is illiterate, he refused to sign a statement against Jack, and that he was then given Valium, rendered semi-conscious and his thumbprint forcibly placed on a statement he never read or made.

4. This violation requires the exclusion of all statements and prosecution evidence. More importantly, it requires the complete dismissal of the case under the law.

M. **Violation of Article 36;** which states that indictment must be delivered to the Court within fifteen days of the arrest, and the Court may extend it an additional fifteen (15) days, and it must be immediately presented to the accused.

1. Even if the Court extended the time, 30 days long passed and the accused have still not see the indictment in the Primary Court.

2. This egregious prejudice to the defense by Chief Judge Bakhtyari and the Primary Court, <u>requires</u> dismissal.

N.  **Violation of Article 38**; which states defense counsel and accused have the right to be present during all interrogations, during searches, and will be notified by the *Saranwal* during the investigation phase to be allowed to be present during all searches, confrontations, and questioning.

1.  Not only were the accused specifically <u>not</u> informed, they were never allowed to be present during <u>any</u> of these activities, and during the investigation there were dozens of interrogations, numerous searches, and repeated questioning.

2.  As examples; Ed Caraballo was repeatedly questioned alone, and in private by the NDS <u>after</u> he had defense counsel, and after he told NDS interrogators that he wanted his lawyer present he was threatened.  But nothing is more alarming or disturbing then the part the FBI played in this case.  Your Country's freedom is new, your people are not yet trained in the law, but the FBI is highly trained and educated in these rights and principals.  During the investigation American FBI agents repeatedly violated every one of these articles.
    * The FBI removed exculpatory evidence from NDS
    * The FBI Destroyed evidence by erasing tapes
    * The FBI destroyed evidence by destroying MOD and DOD documents
    * The NDS acting under the orders of the FBI, conducted repeated interrogations with the accused or without defense lawyers present
    * The FBI took custody of exculpatory evidence illegally in Mid-July 2004
    * The FBI conducted searches and took photos without defense counsel or the accused present.
    * The FBI seized exculpatory evidence again on or about November 27, 2004.

3.  The FBI continues to refuse to return the documents, computer files, computer, videotapes, film, and other evidence, and has refused to provide Ghulamsaki's confession to the Court or the defense, allowing an admitted and known terrorist to kill again (the August DYNCORP bombing).  Further, the NDS and FBI have intentionally withheld the recent arrest of a Supreme Court Judge for his implication in the DYNCORP bombing, and have intentionally released false information to the press stating that the arrested judge was from the Panshir Province, when in reality, he was a close friend of arrested terrorist Malawi Sidiq, and housed the DYNCORP bombers.  This interference by the American FBI in the investigation, withholding of exculpatory evidence and misconduct warrants <u>not</u> only the exclusion of evidence but the immediate dismissal of all charges.  Furthermore, this also violated <u>Article 39, #6</u>.

4.  From the start, this case was illegal.  The NDS officials who entered the compound in *Karte-Parwan* were in fact agents of the FBI and therefore also violated the 4th Amendment of the US Constitution, International Law, and Afghan Law, and they did so in violation of Articles 32, 37, and 38.

O.  **Violation of Article 40**; which states the *Saranwal* shall give notification to the accused of all investigation activities such as interrogations so that the accused may be present.  No notifications have <u>ever</u> been given to any activity.  Interrogations were continually conducted for 5 months without any defense representation EVER.  As just one example, in September, just days before the trial, NDS was still conducting secret interrogations of witnesses without informing the defense.  One of these interrogations was of the driver and bodyguard of General Bishmullah Khan, the Deputy Defense Minister.  Not only should the defense have been present[5] but they should have been informed of the interrogation and given a copy of any statements made, especially because the statements were exculpatory in nature.[6]

P.  **Violation of Article 42;** preparation of trial; which states the indictment shall be served on the accused at least five (5) days in advance.

   1. No indictment was ever served on the accused, in the first court.  Although the accused requested a copy of the indictment on four (4) separate occasions in open court, and every time Jack met with the primary court *Saranwal*, and although the Primary Court ordered the United States Embassy to provide a copy, no copy was ever provided to the accused, until after the second new trial began.
   2. In fact, only a day after the Primary Court ordered the United Stated Embassy to provide a copy of the indictment to the accused the United Sates government advised Mr. Jack they would not provide a copy of the indictment because it was not their responsibility.  The Embassy finally provided a copy several months later, which is mentioned in paragraph 1 above.
   3. This Violation also requires dismissal of all charges.

Q.  **Violation of Article 43**; which states that the accused and defense counsel are entitled to examine the documents (including photographs) in the files and the objects seized.
   1. This is one of the most egregious and severe violations of the <u>Criminal Code</u>.  NOT ONCE have the accused been able to examine <u>any</u> court or evidence file.  The files are waved in the air at the accused, shown to the press, shown to alleged victims, and have been repeatedly promised to the accused.  But still, after ten court appearances in six months, the files have <u>never</u> been seen by the accused.  However, the NDS files have **been sold to the press** by the Primary Court Prosecutor, *Saranwal* Naeem Dawari.

---

[5]  Two American defense lawyers were at NDS headquarters at the time in another room and were completely unaware of the ongoing interrogations.
[6]  That evidence showed that defendants were driving government issued SUVs at the time of the arrest with Ministry of Defense official license plates.

2. Furthermore, the NDS files were given to reporters to review overnight and therefore the chain of evidence was violated and broken.  The files are no longer inviolate, and therefore are tainted evidence.

3. With evidence taken by the FBI, the chain of custody destroyed, documents missing, and repeated violations of almost every section of the <u>Criminal Code</u> this case is a travesty of justice.  No matter what this court does to correct these injustices it is too late, the damage is done, it was done long before the Second Court took over this case.  It was done by untrained police who broke the rules in their zeal to pander to, and help, the FBI.  It was done by NDS officials and the Primary Court *Saranwal* who were under pressure by the American FBI, and it was done by the FBI.  This Court has no choice, when faced with this many blatant and intentional violations but to exclude all prosecution evidence, all statements of all persons (and require testimony as set forth under the law), and finally, to dismiss all charges.

R.    **<u>Violation of Article 48</u>**; which states the Court will give verbal notice to the accused of each successive hearing date and hour, but no notice has ever been given to the American accused because the final orders and the statements of the Primary Court were <u>never</u> translated.  Even still, the accused are only give a few hours notice before a hearing starts.  This press is notified days before, but the accused are usually told only a few hours before.  We are still not notified of the date of new trial hearings.  This IS COMPLETELY ILLEGAL.

S.    **<u>Violation of Article 50</u>**; which states all witnesses over the age of 14 (Fourteen) are duty bound to swear under oath in Allah's name before testifying to tell the truth and be honest in their testimony.

1. No prosecution witness called by the Primary Court *Saranwal* or the Primary Court **was ever required** to swear under oath or in Allah's name, or has ever been required to testify under oath.

2. Only defense witnesses have ever testified under oath in the new trial.[7]

3. All NDS testimony must be stricken under the law and not used in this case.

T.    **<u>Violation of Article 52</u>**; which states that the order of the hearing will be explained to all persons present by the Head of the Court.  Nothing was ever explained to the accused by the Primary Court.  The accused had no idea of what was going on, or in what order it would take place.

---

[7] 1.  Only witness testified under oath at the Primary Court Trial- Jack, who refused to speak unless sworn.

2.  Only 5 people testified during the second trial, ALL defense witnesses, all demanded to be sworn.

3.  Not one prosecution witness has ever testified in either trial.  The 3 prosecution witnesses that <u>spoke</u> in the first trial DID NOT TESTIFY.  They were not sworn under oath and the Court (Judge Bakhtyari) announced the three (3) people were only providing background facts for the press.  No questions were allowed.  No cross-examination, and no confrontation, in violation of the law.  **Therefore, it was a press conference, not a trial.**

U.  **Violation of Article 53;** which states the court reads out the indictment (#3). This prevents the Primary Court *Saranwal* from reading the indictment incorrectly or adding inflammatory statements to incite the Court, which is exactly what happened in this case.  In fact, *Saranwal* Dawari consistently added wild accusations and new lies on a repeated basis to stir up the press and audience into a frenzy.  The defense is now aware that several of the statements in the indictment alleging immorality, were not provided by witnesses in the case, but were unsubstantiated rumors told to Dawari during dinner sessions with journalists, and which he later added into the indictment as fact.

V.  **Violation of Article 53, #3d;** which states the investigating officers must make oral reports at the hearing and provide sworn testimony.

1.  Because the Court has relied only on written investigation reports, the accused have been unable to cross-examine or interrogate the investigating officers.
2.  The denial of the right to confront also violates Articles 5, 15, 16, 32, 43, 50, and 53g of the Interim Criminal Code.
3.  Additionally, the accused MUST be allowed to call the following witnesses: Mustak, Modafea, all NDS investigators, Mohammed Naeem (CIA Liaison on loan to the FBI), Amrullah Saleh (who personally tortured Idema and Rasuli), and Police Commandant Babajan (who greeted Jack at the airport on arrival), NDS Deputy Director Engineer Ali (who worked with Jack during the 2001-2002 war on a weekly basis at the request of the US government), and Police Commandant Basir Salangi (who worked with Jack during the Shomali battle in 2001 and was the officer in charge during the Sidiq raid).

W.  **Violation of Article 53, #3g;** which states the accused can ask questions of the witnesses.  However, three *Saranwal* witnesses "testified"[8] and not once were any of the accused or the defense lawyers allowed to ask questions.  Furthermore, accused were forced to testify but their co-defendants (the other accused) were not allowed to ask them questions, which was a violation of law which requires dismissal.

X.  **Violation of Article 55;** which states that the records and statements of witnesses can <u>only</u> be used as evidence if the accused or their defense counsel were present during the statement and <u>only</u> if they were allowed to ask questions and make objections.  Therefore none of the statements or testimony of <u>any</u> witness can be ever be used in court or for any decision.

---

[8]  *See* prior footnote outlining the in-court statements of prosecution "witnesses."  The first time witnesses were actually forced to testify under oath in private hearings (December 7, 2004) it resulted in the release of 4 people.

Y. **Violation of Article 56;** which states if the *Saranwal* adds additional facts or crimes to the indictment (he did verbally at almost every Primary Court hearing) the accused must be notified in advance to prepare a defense. During each Primary Court hearing the Primary Court *Saranwal* added facts, accusations, and new crimes to the case, yet the accused were <u>never</u> notified in advance, which was a violation of law which requires dismissal.

Z. **Violation of Human Rights;** there is clear and convincing evidence in the possession of the United States Embassy Consular Officer that there was torture in this case, but that torture was <u>not</u> inflicted upon the terrorists. That torture was inflicted upon the accused in violation of <u>Article 5</u>, by the NDS and with the knowledge and approval of the American FBI.

1. The evidence consisted of eyewitness observations of physical injuries, and medical reports.
2. The accused must be allowed to call witnesses to testify in regards to these injuries and torture, and must be allowed to call the government officials who participated in the torture. In fact, anyone at the NDS prison could testify to hearing screams for four and five nights throughout the prison.
3. The FBI agents that witnessed this torture, and later, the affects of the torture, must also be put at our disposal for providing testimony to this Court.

## CONCLUSION

Even ignoring, discounting, and agreeing with all of these violations, blatant on their face, there is one violation that rises above all else. That is the clear statements made by Judge Abdul Basset Bakhtyari, a former Taliban Judge who was allowed by this government to hear a case against Americans, one of which had been fighting the Taliban and al-Qaida terrorists since the first day of the war in 2001.

That was a clear case of injustice and earmarked by egregious prejudice by Judge Bakhtyari against the American and Northern Alliance defendants. It was punctuated and made clear by Bakhtyari's statements to the international press, before he EVER heard one shred of evidence, that all of the defendants were guilty. In fact, Judge Bakhtyari stated on the record with the press, long before the trial ever began, that all defendants were guilty, and announced the defendants' sentences 60 days before the verdict was rendered in Court and before the formal trial ever began.

Additionally, because the Court used a former Taliban Prosecutor as the *Saranwal*, and a former Soviet regime official as the interpreter, without disclosing this to the defense, this violated the presumption of innocence and the fair trial doctrines under the <u>Criminal Code</u>. These were egregious violations; these officials announced to the international press their guilty decision one month before the verdict. In fact, Judge Bakhtyari stated in open court that the defendants were part of the "resistance forces," (maybe he considers Anti-Taliban Forces the "resistance") yet he failed to allow any discussion of defendants' Geneva Convention Status.

**Further,** the violations of Article 4, the presumption of innocence, require dismissal of all charges, and sanctions against Taliban Judge Bakhtyari for violations of the law, and the support of terrorism, which was tantamount to State-Sponsored Terrorism because they were Karzai officials. There is no doubt that the Criminal Code was violated in every way possible. Nor is there any doubt that the entire trial violated the Criminal Code, the rules of International Law, and the Geneva Convention, which takes precedent over all else in the case as an international treaty. The thought that a Taliban Judge, a Taliban Prosecutor, and a former Soviet "Interpreter," could arrest, try, and convict American counter-terrorist operators without a piece of evidence, without a single witness under the law, and without a shred of *due process*, is not unfathomable, but criminal and contrary to every assertion of freedom this government has given to obtain international assistance and support.

**WHEREFORE,** this Court must exclude all evidence, statements, witnesses testimony and physical evidence obtained up to this point, and may not consider it, and therefore <u>must</u> dismiss all charges for more than 26 intentional violations of the <u>Criminal Code</u> by the Primary Court, the NDS, and the American FBI, which are equally culpable for the violations which require immediate dismissal.

This 21st day of January 2005

_____s/_____
Jack

_____s/_____
Brent Bennett

_____s/_____
Ed Caraballo

_____s/_____
Lt. Wahid Rasuli Bandaras

_____s/_____
Major Ezmerai Amin

John Edward Tiffany, *Esquire*
Attorney *For Defendants*
PO Box 190
55 Washington Street
Bloomfield, NJ 07003 USA
Ph: 973/566-9300
Fax: 973/566-0007

Jack Idema, Prisoner of War
c/o Russel Brown, United States Consul
United States Embassy – Afghanistan
6180 Kabul Place, Dulles, VA 20189-6180